Filed 11/24/14  P. v. Cervera CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERIC CERVERA,<br><br>    Defendant and Appellant. | D066500<br><br><br><br>(Super. Ct. No. RIF1201529) |

APPEAL from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge.  Affirmed.

Torres & Torres and Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Eric Cervera of attempted murder (Pen. Code, §§ 187, subd. (a), 664; count 1); possession of marijuana for sale (Health & Saf. Code, § 11359; count 2);

and possession of a short-barreled shotgun (Pen. Code, § 33215; count 3). Additionally, the jury found Cervera intentionally discharged a firearm causing great bodily injury (Pen. Code, §§ 12022.53, subd.( d) & 1192.7, subd. (c)(8); count 1). The jury also found Cervera committed count 1 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

On April 12, 2013, the court sentenced appellant to 32 years to life, plus two years eight months, in state prison.

Cervera contends he was denied his state and federal constitutional rights to due process and fair trial based on prejudicial prosecutorial misconduct. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*1. Prosecution Evidence*

A. Counts 1 and 3: Attempted Murder of Reynaldo Lopez
and Possession of a Short-Barreled Rifle.

On January 17, 2012, at approximately 3:00 p.m., Reynaldo Lopez (Lopez) went to the Mission Market at the corner of Mission Boulevard and Mennes Street in Riverside. Lopez was to meet his friend Kasey Holt (Holt) at the store. Holt was employed at the Mission Market. Upon arriving at the store Lopez learned that Holt had not finished his work shift and was not prepared to leave. Lopez decided to wait outside of the store until Holt's shift ended. For two hours, Lopez stood outside the market and smoked. Periodically, Lopez would enter the store to play a gambling machine and he would also speak to the clerk, Nitaben Patel (Patel).

2

A short time later, while standing outside, Lopez saw Cervera drive by in a van. Cervera saw Lopez and confronted him. Cervera approached Lopez with his hands hidden in the pockets of a grey hoodie. Cervera asked Lopez, "What the fuck you mad dogging me for?" Lopez replied, "Like what?" Cervera again asked why Lopez was "mad dogging" him. Lopez replied, "I don't know what the fuck you are talking about." Cervera asked Lopez, "What the fuck do you want to do?" Lopez responded, "I don't know. What the fuck do you want to do?" Lopez proceeded to state, "You ain't going to do shit."

Cervera pulled out a Smith and Wesson nickel plated .38 caliber revolver from the pocket of his hoodie. Lopez approached Cervera and grabbed the revolver. Cervera responded, "Let go of my fucking strap." Lopez replied, "Fuck that. You are being a little bitch." Lopez refused to let go of Cervera's revolver. Cervera and Lopez struggled for possession of the revolver. Cervera successfully wrestled the revolver away from Lopez and shot him.

At trial, Lopez testified that more than one shot was fired and that he felt being hit. Further, Lopez testified that he saw a "bullet hole in [his] chest." Additionally, Lopez observed injuries to his right armpit and right arm.

Patel identified Cervera in court as the shooter. Patel testified that she heard two or three shots fired. Frank Aceves (Aceves), an automotive mechanic from a nearby repair shop, heard multiple shots fired at approximately 5:30 p.m. Aceves hid behind a wall and heard a projectile hit the wall. Aceves found a bullet on the floor. The bullet was later recovered by police.

3

Meanwhile, Lopez went into the Mission Market and told Holt he had been shot. Lopez told Patel to call an ambulance but was instead driven to the hospital by an acquaintance. While on route to the hospital, Lopez contacted Janessa Gonzalez, the sister of his child's mother, Julianna Gonzalez.[1] Lopez testified that he told Janessa who had shot him and what had happened at the Mission Market. Janessa relayed that information to Julianna and Lopez himself told her at the hospital. Lopez was treated at Riverside Community Hospital by surgeon Dr. William Alex. Riverside County Sheriff's Deputy Santos Cortez interviewed Julianna at the hospital. Julianna told Deputy Cortez that Cervera had shot Lopez and identified him from a photo array.

On January 19, 2012, Riverside Sheriff's Department deputies executed a search warrant of Cervera's residence at 4027 Mennes Avenue. Deputies found a 12-gauge sawed-off shotgun, a rifle, shotgun ammunition and a box of .38 caliber ammunition. Additionally, deputies found a silver-plated revolver. Deputies discovered three spent casings inside the revolver and three live rounds. At trial, ballistics criminalist Michele Nichols testified that the revolver "probably fired" the bullet found at Aceves's auto repair shop.

### B. Count 2: Willful and Unlawful Possession of Marijuana

During the search of Cervera's residence, deputies discovered two boxes containing 157 grams of marijuana and a digital scale. At trial, Riverside Police

---

[1] Both Janessa Gonzalez and Julianna Gonzalez testified at trial. However, Janessa refused to identify Cervera as the shooter and denied being told by Lopez who the shooter was.

Department Detective Matthew Lackey testified that in his opinion the marijuana was possessed for sale rather than personal consumption.

### C. Count 3: Participation in a Criminal Street Gang

During trial, the prosecution presented the testimony of Riverside County Sheriff's Deputy Cortez. Cortez testified about the structure, background, membership, initiation, criminal activities, intimidation, snitching, and respect in Riverside street gangs. After examining the evidence, Cortez concluded that Cervera was an active member of the West Side Rivas (WSR) criminal street gang. Cortez explained to the jury that WSR has roughly about 200 members and that its activities include robbery, burglary, shootings, weapon possessions and drug sales.

### 2. *Defense Evidence*

During trial, Cervera testified that he had known Lopez since they were 13 or 14 years old. At one point, both Lopez and Cervera lived next to each other on Mennes and close to the Mission Market. Cervera testified that he did not belong to WSR. Cervera further testified that he and Lopez had a falling out after a dispute regarding dog breeding. The dispute ended Lopez and Cervera's friendship. Following the dispute, Cervera and Lopez would frequently fight.

Cervera testified that on January 17, 2012, he was in the process of moving back into his parents' home after having a dispute with his girlfriend. Cervera explained that he had spent the night at his parents' house and decided to go over to his grandmother's house in the afternoon to pack. Cervera testified that he decided to take his revolver with him rather than leave it at his grandmother's home. Cervera put the revolver in the pocket

5

of his grey hoodie and left the house. After leaving his grandmother's house, Cervera went to the Mission Market.

Cervera approached the Mission Market and saw Lopez standing out front. Cervera testified that he stopped at the alley and waited for Lopez to leave. After waiting for five minutes, Cervera decided to enter the store. Cervera testified that Lopez confronted him and asked why he had been looking at him. Cervera proceeded to show the gun to Lopez so that he would leave him alone. Cervera testified that he did not point the gun at Lopez.

However, Lopez grabbed the gun and attempted to take it away from Cervera. Cervera testified that he was afraid that Lopez was about to take the gun away and therefore pulled the trigger. Subsequently, Cervera ran to his parents' house. Cervera testified that he did not remember the shooting clearly and did not learn about Lopez's wounds until a few days later.

### 3. Closing Arguments

During his closing arguments the prosecution, as pertinent here, elaborated to the jury on what the law meant when it referred to deliberation and premeditation. Specifically, concerning deliberation the prosecutor stated:

> "Now, attempt murder, 601, the very next instruction is this concept we've probably heard a lot about, is willful, deliberate, and premeditated. Just to find him guilty of an attempt murder, that's all you need right there. Once you find the defendant guilty of attempt murder, you move on to whether it was willful, deliberate, and premeditated. And those three are all defined for you in 601. 601, it defines willful. And it says basically intended to kill. Now, if you recall, we've already discussed this under attempt murder. He has the intent to kill. So we've gotten that.

6

"Deliberate. He deliberated. Deliberation starts before the shot is fired. When does deliberation start in this case? Deliberation starts in this case when the defendant decided he was to carry a firearm that day, well before he even confronted Reynaldo Lopez. Deliberation starts when he decides to take a handgun, load that handgun, and carry it on him. That heavy gun in his hoodie. We also have deliberation -- when you look at the videotape, you see Reynaldo standing there talking to somebody. He stands there for a while. He's thinking about confronting Reynaldo Lopez. He knows Reynaldo Lopez is standing there. He's deciding what it is he's going to do. He knows he has the gun. Deliberations continue.

"Now, when I first heard this, deliberation is defined as carefully weighed and considered for and against his choice and knowing the consequences, decided to kill. When I first heard this term, deliberation, one of the thoughts that came to my mind right away was this sculpture of Rodin the Thinker. You have the contemplating with his fist under his chin and he's in deep thought. That's not what is required for deliberation. Because if that's what was required, you would expect there to be no murders because someone that puts that amount of thought into their actions would never come to the conclusion that it's a good idea to shoot someone outside of a liquor store. Deliberation is like this. We deliberate every day. We deliberate for life and death things every day.

"Think about when we're driving a car. It is a great example. You are going down the street and you approach a light. We've all done it. The light turns from green to yellow. You deliberate. Things run through your mind. You have to make a decision whether you're going to go through that intersection or if you're going to stop. Think about all of the things you think about. You think about is there a vehicle behind you. You may check your rearview mirror really quick. If you apply the brakes too fast, if you're going up that intersection, that person may hit you. You judge the distance between your car and the intersection, how fast you're going, cross traffic, all of these things go through your mind. And you make a decision like that. You can make that decision, it can be reached rather quickly. It can be reached in an instant, but we don't even have that here. What we have is a man going beyond that. He's standing there thinking about what he's going to do. When he walks up, he's got his head down. He's keeping himself concealed and he's in -- he's in the zone. He's got his hand on his gun. He's ready to use that gun. He's accepted the fact that since he's got a loaded gun,

7

he's made the decision to carry that. He can use that gun if he needs to, and he's going to.

"Now, we'll talk about this more, but I'd submit to you should really believe nothing that the defendant says. He made no sense on the stand. But even if you did, the defendant's own words, every time I confront Reynaldo, a fight breaks out. What would a reasonable person think if they're going to confront somebody, an enemy, and they have a loaded handgun, and they are going to walk up to this person who is bigger than them going to confront this person, what do they think is going to happen? And furthermore, he escalates that situation by pulling the gun out. What does he think Reynaldo is going to do? He knew that he was going to use that gun.

"He was expecting Reynaldo to maybe look at him and say, hey, why you looking at me so hard? This escalated rather quickly because the defendant was in control of that situation. Reynaldo grabbed that gun. That's undisputed. You'll see that. If you watch the videotape, you see the defendant having that gun out. You see the shininess of the revolver. Before Reynaldo grabs it, he has it out. It's not right away. He didn't just pull it out and Reynaldo immediately grabs. It's more consistent with what Reynaldo says. He has it out. And when he begins to raise it, Reynaldo grabs it. He doesn't have ahold of it very long. It's very quick. The defendant pulls that away, backs up and shoots three times."

The prosecutor then proceeded to address the issue of premeditation:

"Premeditated. All this means is that he decided to kill before acting, doing the act, that act, of firing the gun. Meaning, the decision to kill was before he actually--he can't pull the trigger, gun someone down and go oh, I didn't mean to do it, then have intent to kill. The intent to kill came before, at any time before he actually pulled the trigger."

## DISCUSSION

Cervera argues that the prosecutor made remarks in closing arguments that constituted prosecutorial misconduct. Cervera claims that the prosecutor violated his state and federal constitutional rights by improperly misstating the law on deliberation

8

and premeditation.  Cervera also argues, to the extent we find he forfeited any of his claims by his defense counsel's failure to object, we should reverse because he received ineffective assistance of counsel.  We disagree.

I

*FORFEITURE*

As the People properly point out, our Supreme Court has held that, when a defendant does not object to remarks in closing arguments claimed to be prosecutorial misconduct, "defendant is deemed to have waived the objection and the point cannot be raised on appeal."  (*People v. Green* (1980) 27 Cal.3d 1, 27.)  The reason for this rule is that " 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " (*Ibid.*)  Thus, "the initial question to be decided in all cases in which defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm.  If it would, the contention must be rejected." (*Id.* at p. 34.)  "[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury."  (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Cervera contends that his defense counsel's failure to object should be ignored because of the "important constitutional interests at stake."  Yet, Cervera's argument is unpersuasive.  It is well established that "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).)  Nothing in the record indicates that

9

objecting to the prosecutor's remark or requesting a jury admonition would have been futile.  Here, Cervera did not properly object on the grounds of prosecutorial misconduct nor did he request an admonition.  Thus, Cervera forfeits his contention on appeal.  In any event, we address his contentions on the merits and conclude no misconduct occurred.

II

*MISCONDUCT*

Even if there was no forfeiture, we conclude the prosecutor did not engage in misconduct.

In California, prosecutors are provided with a wide degree of flexibility during arguments.  (*Hill, supra,* 17 Cal.4th at p. 819.)  "The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom."  (*Ibid*.)  However, "it is misconduct [for a prosecutor] to misstate the law during argument."  (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21.)  "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process."  (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).)  Moreover, when a claim of prosecutorial misconduct focuses on the prosecutor's remarks before the jury, " 'the question is whether there is a *reasonable likelihood* that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' "  (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203 (*Cole*), italics added, quoting *People v. Berryman* (1993) 6 Cal.4th 1048, 1072.)  "In conducting

10

this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970.)

Likewise, conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 283-284.)

Cervera contends the prosecutor's remarks during closing arguments amounted to prosecutorial misconduct because he compared premeditation and deliberation to the decision of whether to run a yellow traffic light. The prosecutor explained how individuals quickly consider factors such as traffic, braking distance, traveling speed, and cross-traffic to determine whether to run a yellow light. Cervera argues these statements "minimized the seriousness of the matter the jury had to consider." Cervera asserts that these statements were equivalent to the troublesome statements made in *People v. Johnson* (2004) 119 Cal.App.4th 976 (*Johnson*) and *People v. Nguyen* (1995) 40 Cal.App.4th 28, 35-36 (*Nguyen*).

However, we are unconvinced. *Johnson* and *Nguyen* both dealt with prosecutors using analogies of mundane daily activities and equating them with proof beyond a reasonable doubt. (*Johnson, supra,* 119 Cal.App.4th at p. 983; *Nguyen, supra,* 40 Cal.App.4th at p. 35.) Yet, Cervera's reliance on these two decisions is misplaced.

In *Nguyen,* the prosecutor told the jury that reasonable doubt is " 'a very reachable standard that you use every day in your lives when you make important decisions,

11

decisions about whether you want to get married, decisions that take your life at stake when you change lanes as you're driving.' " (*Nguyen, supra*, 40 Cal.App.4th at p. 35.)

Similarly, in *Johnson,* the prosecutor in explaining proof beyond a reasonable doubt told the jury, " 'the things that you've done in your own life, there has always been, at the minimum, some kind of bit of doubt in the back of your mind about whether or not what you're doing is right or wrong. Even though you felt really strongly about it, there is still kind of lingering doubt. That's always going to be there.' " (*Johnson, supra,* 119 Cal.App.4th at p. 983.) Thus, both cases focused on the prejudicial effect of misstatements about the burden of proof beyond a reasonable doubt.

Conversely, here, the prosecutor was not using the analogy of a traffic light to define proof beyond a reasonable doubt. Rather, the prosecutor analogized the life experience of running a yellow light to the time necessary to form premeditation and deliberation. The prosecutor sought to explain to the jury that premeditation and deliberation can be arrived at quickly.

Although perhaps inartful and unimaginative, this analogy was not wrong as a description of premeditation and deliberation. The trial court provided the jury with instructions that stated, "a cold, calculated decision to kill can be reached quickly." (CALCRIM No. 601.) Those instructions are consistent with the prosecutor's assertion that premeditation and deliberation can be achieved quickly. Cervera argues that "[t]his comparison to the everyday act of driving was a mischaracterization designed to diminish the prosecution's burden on the issue of premeditation and deliberation." Yet, Cervera's

12

contention that the amount of time it takes to decide whether to run a yellow light is too short and trivial as a matter of law is not supported by any authority.

More importantly, the jury was instructed that any inconsistency it perceived between the jury instructions and the attorney's arguments were to be resolved in favor of the instructions. (CALCRIM No. 200.) We presume the jury in this case understood and followed the trial court's instructions. (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9.) Cervera has not demonstrated that the jury applied the prosecutor's remarks regarding premeditation and deliberation in an objectionable fashion. (*Cole, supra,* 33 Cal.4th at pp. 1202-1203.) Likewise, Cervera has failed to meet the state burden for showing prosecutorial misconduct because there was nothing objectionable or deceitful or reprehensible about the prosecutor's argument. (*Morales, supra,* 25 Cal.4th at p. 44 ["Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or jury."].) Thus, we conclude that the prosecutor's comments were proper and did not constitute misconduct to prejudice the verdict under any standard.

III

*INEFFECTIVE ASSISTANCE OF COUNSEL*

Cervera contends that if this court finds that he forfeited his prosecutorial misconduct claim by failing to object then he has a claim of ineffective assistance of counsel. However, we are not persuaded.

13

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Bonin* (1989) 47 Cal.3d 808, 833-834.) To prevail on an ineffective assistance of counsel claim, the defendant must show that (1) "counsel's performance fell below a standard of reasonable competence" and (2) "prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) Thus, "[e]ven where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*Anderson, supra,* at p. 569.)

Here, Cervera has not demonstrated that his counsel's failure to object fell below a standard of reasonable competence. On direct appeal, a reviewing court may reverse a conviction for ineffective assistance of counsel only if the record affirmatively discloses no rational tactical purpose for counsel's challenged act or omission. (*People v. Vines* (2011) 51 Cal.4th 830, 876; *People v. Ray* (1996) 13 Cal.4th 313, 349; *People v. Fosselman* (1983) 33 Cal.3d 572, 581 (*Fosselman*); *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007.) " '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Salcido* (2008) 44 Cal.4th 93, 172.) Contrary to Cervera's arguments this is not one of those rare cases.

Cervera's trial counsel might have had valid and reasonable tactical reasons for not objecting to the portions of the closing arguments where the prosecutor compared

14

premeditation and deliberation to running a yellow traffic light. Cervera himself acknowledges that "competent counsel is not required to make all conceivable motions or objections." Cervera's defense counsel might have concluded that an objection or request for admonition would simply draw closer attention to the prosecutor's comments. Alternatively, defense counsel might have concluded that rather than objecting he could counter the prosecutor's remarks through his own closing arguments. Cervera's defense counsel reasonably "may have believed that individual objections would have exacerbated the problem by affording the prosecutor an opportunity to elaborate and explain his comment." (*Fosselman*, *supra*, 33 Cal.3d at p. 582.) In sum, there is no evidence in the record to indicate that Cervera's defense counsel's failure to object fell below a reasonable standard of competence.

Likewise, Cervera has not demonstrated that his trial counsel's failure to object resulted in prejudice. As discussed above, we are not persuaded that the prosecutor's remarks were improper. However, even if the statements were improper they would still not rise to the necessary level of prejudice to constitute ineffective assistance of counsel. Improper statements to the jury are prejudicial when " 'there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable manner.' " (*Cole, supra,* 33 Cal.4th at pp. 1202-1203.) Having reviewed the entire record in the present case, including the argument and the instructions given, we find no reasonable likelihood that the jurors construed the prosecutor's remarks during closing arguments to trivialize the legal standards for finding premeditation or deliberation.

Moreover, we find no reasonable likelihood that the jury interpreted the prosecutor's remarks as shifting the burden of proof or reducing proof beyond a reasonable doubt.

We conclude that trial counsel's failure to object to the prosecutor's remark during closing argument was not prejudicial because there is no " 'reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*Cole, supra,* 33 Cal.4th at pp. 1202-1203.)  Therefore, we find no merit in the defendant's claim of ineffective assistance of counsel.

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

McDONALD, J.